UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                      Plaintiff,

       -against-

JASON JADIDIAN,

                      Defendant.

**MEMORANDUM OPINION
& ORDER**

08 Civ. 8079 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        This case arises out of Defendant Jason Jadidian's participation in a conspiracy to promote Tecton Corporation ("TTNC") stock through unlawful means. His conduct resulted in criminal prosecution, a guilty plea to conspiracy to commit commercial bribery, and a sentence of three years' probation and a $10,000 fine. (Pltf. Rule 56.1 Stmt. ¶¶ 6-7)

        In this parallel civil action, Plaintiff Securities and Exchange Commission seeks three additional civil penalties against Jadidian: (1) a permanent injunction barring him from violating Section 17(a) of the Securities Act, 15 U.S.C. § 7q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); (2) a bar preventing him from participating in any offering of "penny stock"; and (3) a civil monetary penalty. The parties have cross-moved for summary judgment on the issue of whether these civil penalties are warranted. For the reasons stated below, Jadidian's motion will be GRANTED – and the SEC's motion will be DENIED – as to the permanent injunction and the penny stock bar. As to the civil penalty, this Court will impose a "second-tier" civil penalty of $50,000.

## BACKGROUND

In 2006, at the age of 21, Jason Jadidian founded Vigilant Trader, Inc., a Delaware corporation that operated the website VigilantTrader.com.  (Pltf. Rule 56.1 Stmt. ¶ 11)  The following year, he formed Next Level Consulting Firm, Inc., a Delaware corporation that operated the website TheBestStockPick.com.  Jadidian was the sole employee of both of these companies, which he operated from his home.  (Pltf. Rule 56.1 Stmt. ¶ 14)[1]

Vigilant Trader, Inc. advertised public companies on its website and in a newsletter distributed through its website.  (Pltf. Rule 56.1 Stmt. ¶ 12)  Jadidian also referred companies to other websites, such as BestDamnPennyStocks.com.  (Pltf. Rule 56.1 Stmt. ¶ 12)  From these services, Jadidian earned approximately $300,000 in 2007 and $1 million in 2008.  (Pltf. Rule 56.1 Stmt. ¶ 15)  Jadidian achieved these earnings despite having only a high school education, no financial courses, and no financial services training.  (Jadidian Decl. ¶ 3)

In April 2008 -- when Jadidian was 23 years old -- he received an email from "Charlie Moore," an undercover FBI agent, who purported to be a middleman who could arrange stock purchases by stockbrokers (known as registered representatives, or "RRs") with discretionary authority over the accounts of wealthy investors.  (Pltf. Rule 56.1 Stmt. ¶ 19; Def.

---

[1] To the extent that this Court relies on facts drawn from the SEC's Local Rule 56.1 statement, it has done so because Jadidian has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where Jadidian disagrees with the SEC's characterization of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Jadidian's characterization of the evidence.  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).  The converse is true with respect to Jadidian's cross-motion for summary judgment.

Reply Rule 56.1 Stmt. ¶ 67)  At about this time, Chad Smanjak, a representative of TTNC, expressed interest in using Jadidian's advertising and web services.  (Pltf. Rule 56.1 Stmt. ¶ 25; Def. Rule 56.1 Stmt. ¶¶ 25, 69)  Between April and August 2008, TTNC stock was a "penny stock" within the meaning of the Exchange Act, because it did not sell at or above five dollars per share, and TTNC had average revenue of less than $6 million and net tangible assets of less than $2 million.  (Pltf. Rule 56.1 Stmt. ¶ 10; Def. Rule 56.1 Stmt. ¶ 10)

During a telephone conversation on April 22, 2008, Jadidian asked Charlie if he had received an earlier message from Jadidian regarding a possible arrangement to promote TTNC stock.  (Pltf. Rule 56.1 Stmt. ¶ 22)  During this call, Charlie discussed arranging for his RRs to purchase 50,000 shares of TTNC stock.  (Pltf. Rule 56.1. Stmt. ¶ 26)  He also told Jadidian that he would be ready to do a test transaction the following week.  (Pltf. Rule 56.1 Stmt. ¶ 28)

Jadidian and Charlie spoke again on April 25, 2008.  During that conversation, Jadidian stated that TTNC's trading price and volume had recently declined.  (Pltf. Rule 56.1 Stmt. ¶ 29)  Charlie asked if Jadidian had "any friendly market makers out there that are gonna help keep this thing up?"  Jadidian responded, "[T]hey'll be fine . . . there's not much in the way. There's not much actually out there, so they'll move pretty easily."  (Pltf. Rule 56.1 Stmt. ¶ 30)

In this same call, Charlie reiterated that he had RRs who controlled the accounts of wealthy investors and that these RRs were prepared to purchase TTNC stock. (Pltf. Rule 56.1 Stmt. ¶ 31)  Charlie inquired whether "the company's fine with the thirty points on it?" – meaning that TTNC had agreed to a 30% kickback in exchange for the purchase of TTNC stock.  Jadidian responded, "Yeah . . . everything is fine."  (Pltf. Rule 56.1 Stmt. ¶ 33)

The two men agreed to a test transaction in which the RRs would purchase $35,000 of TTNC stock on behalf of their customers.  (Pltf. Rule 56.1 Stmt. ¶ 33)  Charlie indicated that if he received his kickback payment after the test transaction, the RRs would be ready to "hit it hard" – that is, purchase a larger quantity of the TTNC stock – a few weeks later.  (Pltf. Rule 56.1 Stmt. ¶ 34)

Charlie then asked about where his payment would be coming from and how long it would take.  Jadidian said that the payment would likely come from outside the United States.  After Charlie indicated that his account was in the United States, Jadidian stated it was sometimes a "a pain in the ass" to arrange payment to a U.S. account, and asked Charlie if he had a "place out of here."  (Pltf. Rule 56.1 Stmt. ¶ 35)

The next day, Charlie called Jadidian and reported that he was going to buy 80,000 shares of TTNC.  (Pltf. Rule 56.1 Stmt. ¶ 43)  Jadidian instructed Charlie to look at the right side of his computer screen and to buy "from those three lined up there . . . the one with the 2-3 mark."  (Pltf. Rule 56.1 Stmt. ¶ 44)  Later that day, Charlie called Jadidian to confirm that the RRs had purchased 80,000 shares at $0.2334 per share.  (Pltf. Rule 56.1 Stmt. ¶ 45)  Jadidian himself did not purchase TTNC shares that day, or at any point.  (Pltf. Rule 56.1 Stmt. ¶ 56; Def. Reply Rule 56.1 Stmt. ¶ 56)

On May 13, 2008, Charlie and Jadidian spoke about Charlie's payment.  Charlie asked for the name of the person to whom he should send his bank information, and Jadidian revealed that the person's name was "Chad."  However, Jadidian also indicated that he was not authorized to reveal Chad's last name.  (Pltf. Rule 56.1 Stmt. ¶ 49)  Two days later, Charlie called Jadidian and asked again for the name of the person who would send his kickback payment, saying "I placed eighty thousand shares of TTNC and I'm looking for five grand . . .

4

I'm going to take money from somebody.  I need to know who I'm taking money from."  (Pltf. Rule 56.1 Stmt. ¶ 52)  Jadidian spoke to Charlie later in the day and assured him that he was trying to arrange for someone to call Charlie so that the payment issue could be resolved. Jadidian also told Charlie that he hadn't "gotten anything" from the transaction.  (Pltf. Rule 56.1 Stmt. ¶ 54)

On May 29, 2008, Jadidian told Charlie that the kickback money had been wired to Aarif Jarmani, who had been instructed to wire the money to Charlie.  (Pltf. Rule 56.1 Stmt. ¶ 53)  On July 28, 2008, Jamani wired $5,000 from an account in British Columbia, Canada to a New York bank account that Charlie used.  Jamani received $600 for his efforts.  (Pltf. Rule 56.1 Stmt. ¶ 55)

In the months following the "test transaction," TTNC stock depreciated significantly:  on May 1, 2008 it closed at $0.23 per share, but on July 1, 2008 it closed at $0.016 per share.  (Pltf. Rule 56.1 Stmt. ¶ 56)

On September 18, 2008, Jadidian was arrested on a criminal complaint which charged him with violations of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), as well as Rule 10b-5, 17 C.F.R. § 240.-10b-5.  (Def. Rule 56.1 Stmt. ¶ 4)

On November 12, 2008, the United States Attorney for the Southern District of New York filed a criminal information against Jadidian (Pltf. Rule 56.1 Stmt. ¶ 5), and Jadidian pleaded guilty to conspiracy to commit commercial bribery in violation of 18 U.S.C. § 371. (Pltf. Rule 56.1 Stmt. ¶ 6)  During his plea allocution, Jadidian provided the following account of his offense:

> From April 2008 to July 2008, I was engaged in the business of . . . consulting and public awareness for publicly traded companies. I also owned a web site known as "Vigilante Trader" that I used in connection with my business. My business was based primarily in New York City, New York. . . .
>
> In April 2008 in New York City, I was introduced to a person who identified himself as Charlie Moore, but whom I now know is the undercover agent identified in the information filed in this case. After I met Charlie, he e-mailed me and asked me on several occasions to call him. Charlie indicated he was interested in a company that was known as Tecton, and he said he would like to bring his buyers into the stock. Although I did not own any Tecton stock myself, and although I did not intend to pay any commissions or make any other payments to Charlie, Charlie told me that he wanted to be paid 30 percent of any purchases of Tecton stock that he arranged.
>
> I passed Charlie's request on to others who were promoting Tecton stock, and I know from my conversations with them that they agreed to make the payments that Charlie wanted. . . .
>
> Later I learned that Charlie had caused accounts he controlled to buy 80,000 Tecton shares worth approximately $18,000. I also learned that other persons involved in the promotion of Tecton stock wired $5,000 to Charlie to pay him for arranging the purchase of the Tecton shares.
>
> Although I personally did not sell any of the Tecton stock that Charlie purchased and I did not make the payment to Charlie, I helped these transactions by passing telephone messages between Charlie and others. I did not, however, earn any commission or other payment as a result of Charlie's purchase of Tecton shares.

(Sukhatme Decl., Ex. 5, at 19-21)

During his allocution, Jadidian admitted that TTNC representative Chad Smanjak and Smanjak's associate, Andy Baum, were responsible for paying Charlie's kickback. (Id. at 22, 24) Jadidian also stated that he had participated in the scheme in order to induce TTNC to purchase advertising from his businesses. (Id. at 27)

On March 11, 2009, Jadidian was sentenced to three years' probation and a $10,000 fine. (Pltf. Rule 56.1 Stmt. ¶ 7)

6

Since his conviction, Jadidian has operated his current business, Market Wrap Media, Inc., which includes the website MarketWrapDaily.com and a newsletter called Market Wrap Daily. (Def. Rule 56.1 Stmt. ¶ 73) The purpose of the newsletter and website is to provide neutral coverage of daily market activities, including earnings reports and financial news. (Def. Rule 56.1 Stmt. ¶ 74)

The SEC notes that while Jadidian operated his previous businesses, he sold advertising to companies whose managers have been charged with securities fraud. All of those business relationships began before Jadidian's arrest in this case, however. (Pltf. Rule 56.1 Stmt. ¶¶ 57-66) Moreover, all but one of those business relationships ended with Jadidian's arrest, and the one remaining relationship ended five months after Jadidian's sentence. (Pltf. Rule 56.1 Stmt. ¶¶ 61-63)

## DISCUSSION

### I.  SUMMARY JUDGMENT

Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). "'[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.'" Watson v. Consol. Edison Co. of N.Y., Inc., 374 F. App'x 159, 161 (2d Cir. 2010) (quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment . . . .[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

### A. **Permanent Injunction**

The SEC has asked that the Court "permanently enjoin Jadidian from future violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5."[2]  (Def. Br. 13)

The Securities Exchange Act provides that "[w]henever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter . . . [the SEC] may in its discretion bring an action in [federal court] to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond."  15 U.S.C. § 78u(d)(1). Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act provide for the imposition of permanent injunctive relief when "the defendant's past conduct indicates . . . that

---

[2] Although Jadidian pleaded guilty to conspiracy to commit commercial bribery, he concedes that his offense conduct constitutes a violation of these securities laws.  (Def. Br. 6) Accordingly, this Court considers only the appropriateness of the relief requested by the SEC.

there is a reasonable likelihood of further violation in the future."[3]  SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 99 (2d Cir. 1979) (quotations omitted); see also SEC v. Monarch Fund, 608 F.2d 938, 943 (2d Cir. 1979) (upholding district court's denial of injunctive relief where the SEC failed to show likelihood of recurrence).

In determining whether a permanent injunction is appropriate, a court should consider

> the fact that defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an "isolated occurrence;" whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

Commonwealth Chem. Sec., 574 F.2d at 100.

Jadidian's conviction does not alone provide an adequate basis for granting permanent injunctive relief:  the Second Circuit has emphasized "the need for the SEC to go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence." Id. at 100 (citation omitted).

Here, the SEC argues that all of the other relevant factors weigh in favor of granting permanent injunctive relief.  The Commission argues that Jadidian's conduct was "egregious and brazen" and that he was a "full participant" in a "fraudulent scheme to manipulate the market for TTNC stock through broker bribery and matched trading."  (Def. Br. 13)  While Jadidian knowingly participated in illegal conduct, the facts in the record present a more complex picture.

---

[3] The admissions Jadidian made in connection with his November 2008 guilty plea apply with full force here.  "It is well-settled that a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case."  United States v. Podell, 572 F.2d 31, 35 (2d Cir. 1978).

Jadidian – 23 years old at the time – was not the mastermind of this crime. He arranged the transaction at the behest of the undercover agent and TTCN's Chad Smanjak. He was a facilitator and messenger between the agent and Smanjak. Jadidian's motives were not pure: he facilitated the transaction because he considered TTCN an important potential client for his advertising business, and he believed that his illegal conduct would help his business relationship with Smanjak. (Sukhatme Decl., Ex. 5, at 19-21, 27) Jadidian never invested in TTNC stock, however, and he obtained no financial benefit from the TTNC stock transaction. (Def. Reply Rule 56.1 Stmt. ¶ 67; 56) There is likewise no persuasive evidence that investors suffered economic loss as a result of Jadidian's conduct. In sum, this Court cannot find that Jadidian acted with a particularly high "degree of scienter" when he participated in the commercial bribery scheme. See S.E.C. v. 800america.com, Inc., 2006 WL 3422670, at *11 (S.D.N.Y. Nov. 20, 2006) (denying permanent injunctive relief where defendant did not "initiate[] the fraud" but instead "acted at the behest of her co-defendant").

In determining whether permanent injunctive relief is warranted, this Court must also consider "whether the infraction is an 'isolated occurrence.'" Commonwealth Chem. Sec., 574 F.2d at 100 (citing and quoting SEC v. Commonwealth Chem. Sec., Inc., 410 F. Supp. 1002, 1020 (S.D.N.Y. 1976)). This is Jadidian's only criminal conviction. While the SEC references "financial transactions between Jadidian and other stock promoters who have been criminally and civilly charged with violations of the antifraud provisions," (1) there is no indication that Jadidian had anything to do with these promoters' violations; and (2) nearly all of those business relationships ended two or more years ago. Given that the SEC has not offered proof of other violations committed by Jadidian, this Court must conclude that the TTCN episode – which took place over approximately one month – was an "isolated occurrence." Cf. SEC v. Tandem

Mgmt., 2001 U.S. Dist. LEXIS 19109, at *40 (S.D.N.Y. Nov. 21, 2001) (granting permanent injunction largely on the grounds that "the facts established at [the defendant's] criminal trial reveal not an isolated instance of misconduct but rather a complex pattern of fraud and deception spanning about four years"); SEC v. Todt, 2000 U.S. Dist. LEXIS 2087, at *37 (S.D.N.Y. Feb. 24, 2000) (granting permanent injunction where "[t]he [defendants] did not commit an isolated infraction, but instead committed repeated violations over the course of an extended period of time").

The next consideration is "whether defendant continues to maintain that his past conduct was blameless." Commonwealth Chem. Sec., 574 F.2d at 100. Here, Jadidian entered a guilty plea less than two months after his arrest, and expressed regret during the criminal proceedings and in a declaration filed in this action. (Jadidian Decl. ¶ 11) The SEC claims that Jadidian has "attempt[ed] to minimize his fraudulent conduct by claiming 'stupidity' and characterizing his role as only a 'messenger.'" (Pltf. Reply Br. 1) But Jadidian's characterization of his role is supported by the evidence; he was neither the scheme's instigator nor its primary beneficiary. The fact that Jadidian has called the Court's attention to his limited role in the scheme does not detract from his prompt acceptance of responsibility.

The final consideration – "whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated" – weighs most heavily in favor of injunctive relief. Commonwealth Chem. Sec., 574 F.2d at 100. Jadidian continues to accept advertising for publicly traded companies: he publishes a newsletter covering stock market activities. His new company clearly distinguishes advertisements from news, however, and Jadidian has retained counsel to ensure that his disclaimers are appropriate.

On balance, the SEC has not met its burden of demonstrating that Jadidian is likely to commit future securities violations.  Accordingly, the Court will not impose a permanent injunction.

### B.     Penny Stock Bar

The SEC has also asked this Court to impose a "penny stock bar" on Jadidian. Section 78(u) of the Securities and Exchange Act provides:

> [In a civil proceeding] against any person participating in, or, at the time of the alleged misconduct who was participating in, an offering of penny stock, the court may prohibit that person from participating in an offering of penny stock, conditionally or unconditionally, and permanently or for such period of time as the court shall determine. . . .
>
> For purposes of this paragraph, the term "person participating in an offering of penny stock" includes any person engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of, any penny stock.

15 U.S.C. § 78u(d)(6)(A); 15 U.S.C. § 78u(d)(6)(B).

"The standard for imposing [a penny-stock] bar essentially mirrors that for imposing an officer-or-director bar." U.S. S.E.C. v. Universal Exp., Inc., 475 F. Supp. 2d 412, 429 (S.D.N.Y. 2007).  Section 78u provides for an officer-or-director bar where "the person's conduct demonstrates unfitness" to serve as an officer or director.  15 U.S.C. § 78u(d)(2).  The Second Circuit has directed lower courts to consider six factors in making a fitness determination:  "(1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." S.E.C. v. Patel, 61 F.3d 137, 141 (2d Cir. 1995) (internal citations omitted).

12

As noted above, these factors do not weigh in the SEC's favor. Although Jadidian participated in criminal conduct, his conduct was not particularly "egregious." He is not a repeat offender, and he did not instigate the fraud. He had no economic stake in the violation: as his plea allocution makes clear, the only benefit Jadidian hoped to receive from the scheme was a better business relationship with Chad Smanjak, and perhaps an advertising purchase. Given his age, the absence of a criminal record, and the lack of any evidence that Jadidian has engaged in misconduct since his arrest in September 2008, this Court cannot conclude that there is a likelihood that Jadidian will engage in misconduct again. See S.E.C. v. Freiberg, 2007 WL 2692041, at *23 (D. Utah Sept. 12, 2007) (declining to impose penny stock bar where "[defendant's] occupation might present opportunities for future securities violations, but there is no evidence he has participated in a violation since the events at issue here").

Accordingly, a penny-stock bar will not be imposed.

C. **Civil Monetary Penalty**

The Remedies Act provides for three levels of civil monetary penalties. The first tier – the lowest level – provides for a $5,000 penalty where the defendant is a natural person. 15 U.S.C. § 77t(d)(2)(A). The second tier penalty applies where the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." The second tier provides for a maximum penalty of $50,000. 15 U.S.C. § 77t(d)(2)(B). The third tier penalty applies where the defendant engaged in the conduct referenced in the tier two provision, but that conduct also "directly or indirectly resulted in substantial losses or created a significant

risk of substantial losses to other persons." A civil penalty of up to $100,000 is authorized in the third tier. 15 U.S.C. § 77t(d)(2)(C).[4]

The purpose of these penalties is to create meaningful financial disincentives to participating in fraudulent conduct. Congress and the courts have recognized that disgorgement alone is frequently not sufficient:

> "Disgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud. A violator who avoids detection is able to keep the profits resulting from illicit activities. Currently, even a violator who is caught is required merely to give back his gains with interest, leaving him no worse off financially than if he had not violated the law. The Committee therefore concluded that authority to seek or impose subsantial money penalties, in addition to the disgorgement of profits, is necessary for the deterrence of securities law violations that otherwise may provide great financial returns to the violator."

SEC v. Coates, 137 F. Supp. 2d 413, 428-29 (S.D.N.Y. 2001) (quoting H.R. Rep. No. 101-616 (1990)); see also SEC v. Moran, 944 F. Supp. 286, 296 (S.D.N.Y. 1996) (quoting the same House report); SEC v. Kane, 2003 U.S. Dist. LEXIS 5043, at *9-*10 (S.D.N.Y. Apr. 1, 2003) (same). In determining the appropriate civil penalty, the court may consider "(1) the egregiousness of the defendant's conduct, (2) the degree of the defendant's scienter; (3) whether the conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the conduct was isolated or recurrent; and (5) whether the penalty should be reduced in light of the defendant's demonstrated current and future financial condition." Kane, 2003 U.S. Dist. LEXIS 5043, at *11; see also Coates, 137 F. Supp. 2d at 429 (listing same factors).

---

[4] The penalty provisions also permit the Court to impose a penalty in the "gross amount of pecuniary gain to [the] defendant as a result of the violation," if that amount exceeds the ceilings otherwise provided for in the penalty statutes. See 15 U.S.C. § 77t(d)(2)(A). That alternative maximum is not at issue here, however, because Jadidian realized no pecuniary gain from his criminal conduct.

These factors have been discussed above. In considering an appropriate civil penalty, however, this Court must also acknowledge that the remedies statute clearly provides for the imposition of a second-tier penalty where the defendant's violation "involved fraud, deceit, manipulation, or deliberate and reckless disregard of a regulatory requirement." 15 U.S.C. § 77t(d)(2)(B). The record here makes clear that Jadidian engaged in conduct that violated the antifraud provisions of the Securities and Exchange Acts.

Moreover, the record shows that Jadidian has accumulated significant wealth in his penny stock advertising career: he earned approximately $300,000 in 2007 and $1 million in 2008. (Pltf. Rule 56.1 Stmt. ¶ 10) The civil penalty imposed must be adequate to provide the necessary financial disincentive envisioned by Congress. The Court is also mindful that Jadidian's criminal sentence included a relatively modest fine of $10,000.

Under all of these circumstances, this Court finds that the maximum second-tier penalty is appropriate. Accordingly, judgment will be entered against Jadidian for a civil penalty in the amount of $50,000.

## CONCLUSION

The SEC's motion for summary judgment (Dkt. No. 17) is DENIED to the extent it seeks a permanent injunction and a penny stock bar, but is otherwise GRANTED. Jadidian's motion for summary judgment (Dkt. No. 24) is GRANTED to the extent it opposes entry of a permanent injunction and penny stock bar, but is otherwise DENIED. A $50,000 civil penalty is imposed on Defendant Jadidian. The Clerk of the Court is directed to terminate both motions (Dkt. Nos. 17, 24), to enter judgment against Defendant Jadidian in the amount of $50,000, and to close this case.

Dated: New York, New York
       March 31, 2011

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge